Putnam J.
The defendants undertook to indemnify the plaintiff, if he should be prevented from earning his freight by any of the perils contained in the policy. The plaintiff alleges that he has lost the freight by reason of the sea damage which happened to the ship. The defendants, on the other hand, contend, that the plaintiff has given up the voyage without any reason for which the defendants are responsible.
It appears that within a few days after the ship sailed from Richmond, she was obliged to put into Kennebunk to repair the sea damage she had sustained ; that the master offered to repair her ; and that she could have been repaired and could have proceeded upon the voyage in two months. Was the merchant obliged to wait that time to enable the master to make the repairs ? If he was, then the contract of affreightment was only suspended by reason of the disaster which befell the ship, and the master should have repaired his ship and proceeded. But if the contract was terminated by the perils which the ship encountered, the plaintiff must recover.[1] 2Neither party is at liberty to abandon the contract, without the consent of the other, or without legal cause which was not procured or occasioned by the fault of the party who relies upon it.
The books are not very definite, as to the time allowable to the master to repair and go on with his voyage. Some of the foreign regulations seem not to be consonant with reason, experience or convenience, when applied to the usage of our own country. Thus, for example, according *116 to the Laws of the Hanse Towns, three clays at most are allowed to the master to repair. By the Laws of Oleron, art. 4, if the master can readily repair his vessel, he may do it, or if he pleases, he may freight another ship to perform the voyage. By the Laws of Wisbuy, art. 16, it is said, that the master may fit out his ship, if he can do it in a little time. Molloy (bk. 2, c. 4, § 5,) remarks, that in such case the master may either mend his ship or freight another. He uses no words of restriction as to the time. And a distinguished English judge, (Lawrence,) in the case of Cook v. Jennings, 7 T. R. 381, adopts the general doctrine without limitation ; “ When a ship is driven on shore, it is the duty of the master either to repair his ship or to procure another. So in Beawes’s Lex Merc. 135 ; “ He may either mend his own ship or freight another.” In the Marine Ordinance of France, book 3, tit. 3, Of Freight, art 11, the rule is expressed without limitation as to the time ; “ If the master is obliged to cause his ship to be refitted during the voyage, the freighter shall be obliged to wait, or pay his whole freight.” Abbott (part 3, c. 7, § 10) says, if the master will, he may repair his ship, if he can do it speedily.
What is to be understood by repairing readily, or speedily, or in a little time, must depend upon the circumstances of the case. Chief Justice Kent, speaking of a ship which was repaired in seventeen days, observed that she was in a condition to be immediately repaired. Griswold v. New York Ins. Co., 3 Johns. R. 327.
The result would seem to be, that the master might, if he pleased, have repaired in a reasonable time. And that time may be illustrated by considering what a prudent master would have done, if there had not been any insurance, and if there had not been any objection on account of the market; with which it is well known that underwriters have no concern. It is said by Gibbs C. J., in Gernon v. The Royal Exch. Assurance Co., 6 Taunt. 387, that the assured is not to elect whether he will abandon or not as the markets rise and fall ; that he has no right to govern his conduct by any such rule, hut must act without reference to the state *117 of the markets. And in the case at bar, it seems to us, that nothing but some other employment of the ship, or some other or more promising expectation relating to the disposition or destination of the cargo, or some circumstance affecting the market, would have altered the original plan of the voyage No prudent ship-owner would have hired another ship to carry on the cargo, when he could so expeditiously have repaired his own.
One test of this reasoning would be, to consider whether the merchant had a right to his goods at Kennebunk, against the will of the ship-owner, without paying freight. It has been already said, that the contract of affreightment is not to be terminated at the will of one of the parties only. Delays not occasioned by the fault of the owner or master of the ship may take place, which may operate most unpropitiously upon the merchant. Such are the delays by contrary winds, as that the best planned voyages are often frustrated. Such may be the case of an embargo. Such was the case in Palmer et al. in Error v. Lorillard, 16 Johns. R. 348, cited by the counsel in the case at bar. Palmer and others had undertaken to carry some tobacco from Richmond to New York for Lorillard, and the ship sailed upon the voyage in February ; but finding the Chesapeake blockaded, she returned to Richmond. Lorillard there demanded his goods in September, but the master refused to deliver them without being paid half of the freight, and in a few days the vessel and cargo were totally lost in a storm at the wharf. And the court held in that case, that the contract was only suspended by the blockade, and that the owners of the ship might detain the goods until they could prosecute the voyage in safety, unless the merchant would pay full freight. There the delay was three times as great as would have been suslavned by the plaintiff in the case at bar, if he had repaired his ship. The opinion of the court was pronounced by the learned Chancellor Kent, and the law upon this subject was stated in a most able manner.
The case of Anderson v. Wallis, 2 Maule & Selw. 245, cited by the counsel for the defendants, is very strong to prove, that delays which frustrate the voyage by preventing *118 an arrival at an intended market, are not a cause of abandonment. That was a policy on goods, with warranty against particular average, from London to Quebec. The ship sailed in September, and received sea damage, and was obliged to bear away for Cork. She was run into Kinsale harboui in October, but was so much damaged, that she could not be repaired in time to reach Quebec that season. The cargo existed, but in a damaged state. The assured abandoned and claimed a total loss. Lord Ellenborough delivered the opinion of the court, and a part of it is very applicable to the case at bar. He says, “ Disappointment of arrival is a new head of abandonment in insurance law. If wherever a disappointment were to arise, an abandonment might be made, then supposing the ship had sailed on her voyage, hut had not arrived in the river St. Lawrence until after the frost set in, and was consequently obliged to wait there until the next season, that would have been a cause of abandonment, according to this rule.” In that case the court held the disaster to have been only a cause of temporary suspension of the voyage ; assuming that a total loss of a cargo might be effected, not merely by the destruction of it, but by a total and permanent incapacity of the ship to perform the voyage. The delay in that case was three times as great as that which would have been sufficient to repaii the ship in the case at bar.
In the case of Hadley v. Clarke et al., 8 T. R. 259, the delay was occasioned by an embargo. That was a suit by the merchant against the owner of the ship, for not carrying a cargo of goods from Liverpool to Leghorn. The ship sailed from Liverpool to Falmouth in June 1796, and while there waiting for convoy, on the 27th July, 1796, an embargo was laid on all vessels bound to Leghorn, until the further order of the Board of Privy Council. In August 1798, the ship returned to Liverpool, where the master relanded the goods without the merchant’s consent. And in that case the court determined, that the embargo had not dissolved, but had merely suspended the contract.
In the case at bar, if the vessel, instead of receiving the sea damage which she did, had been prevented from arriv *119 ¿ng at Nice, her port of destination, in time for the fall cone ours, merely by contrary winds and tempestuous weather, the insurers would not have been answerable. Or if she had arrived before the concowrs, and there had been such great importations of tobacco as to render it impossible to sell the cargo, the defendants would not have been answerable.
Now Roccus, with great reason, as it seems to us, considers the detention of a ship in port by bad weather, upon the same footing as a detention to make repairs. Fid. Roccus, note 67, where he says, in such case the charter party is not dissolved.
We have seen that the underwriters have nothing to do with the market. They do not stipulate that the voyage shall be performed in a given time ; it is only that it shall not be prevented from being performed at some time, by the risks which they have assumed.
This case is not like that of the Isabella, 4 Rob. Adm. Rep. 77, where a cargo of fish would have been detained by an embargo so long that it could not support the delay. There it was held that the master was not entitled to any freight, because the court thought it was impossible that he could fulfil the contract. But the tobacco, in the case at bar, for any thing that appears, would have been in as good condition if it had been carried to Nice after the concowrs, as it would have been if carried there before that event.
The decision to which this course of reasoning leads, accords with the equ'ty of the case ; for the plaintiff ought to establish his right at law very clearly in such a case as is now presented. He has employed his ship but a very few days in the business. He has her at home, or near it, ready to be employed in any other adventure, and seeks to recover his freight from the underwriters, which it would have cost him much expense of money and time to have earned in proceeding to Europe. If however the disaster which happened had terminated the contracts, those consequences would have followed. But we are satisfied that the master has lost the freight by his own act in giving up the voyage. He had an interest in carrying the cargo, which he was not *120 obliged to abandon on account of the accident that happenec^ 1:0 *e ship. He might lawfully have insisted upon detaining the goods while the repairs could have been made ; which it seems to us could have been made in a reasonable time.
The opinion of the Court is, that the verdict for the plaintiff must be set aside, and that the plaintiff should become nonsuit.

 In Am. Ins. Co. v. Center, 4 Wendell, 54, Walworth, Chancellor, speaking of a case in which it is necessary to send on the cargo by another vessel, says, that “ if the expense of sending on the cargo will exceed a moiety of the freight, it is a technical total loss of the freight, which will authorize the insured to abandon.” See Center v. Am. Ins. Co., 7 Cowen, 584; Whitney v. New York Firemen's Ins. Co., 18 Johns. R. 210; Robinson v. Marine Ins. Co. 2 Johns. R. 326.